IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVA DANIELLE FOX, *Plaintiff*, | § | NO. 1:26-CV-531-DAE |
| vs. | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, *Defendant*. | § | |

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Before the Court is the University of Texas at Austin's ("the University" or "Defendant") Motion to Dismiss (Dkt. # 9) Eva Danielle Fox's ("Plaintiff" or "Fox") Amended Complaint ("FAC") (Dkt. # 8). The Court finds these matters suitable for disposition without a hearing. After careful consideration of the filings and the relevant law, the Court **GRANTS** the University's Motion to Dismiss (Dkt. # 9).

BACKGROUND

The Court will first recite the case's procedural history before detailing the factual and legal allegations Fox raises in her FAC.

I. Procedural History

Plaintiff initiated this action by filing a complaint in this Court on March 3, 2026. (Dkt. # 1.) On May 8, 2026, Defendant filed a motion to dismiss. (Dkt. # 7.) Then, on May 29, 2026, Plaintiff filed her FAC within the time allotted by Federal Rule of Civil Procedure 15. (Dkt. # 8.) Defendant renewed its Motion to Dismiss on June 12, 2026. (Dkt. # 9.) Plaintiff then filed a Response in Opposition on July 6, 2026. (Dkt. # 10.)[1] Defendant replied on July 13, 2026. (Dkt. # 11.)

II. Factual Allegations[2]

Plaintiff worked for Defendant as a Grants and Contracts Specialist in the University's Department of Computer Science ("the Department").[3] (Dkt. # 8

[1] The Court notes that Plaintiff's Response was untimely. (See Dkt. # 11 (noting the untimeliness and arguing that the Court grant the University's Motion as unopposed per Local Rule CV-7(d)(2)).) However, the Court is also mindful that "[t]he Fifth Circuit favors disposition on the merits," so it will consider Plaintiff's Response. Ponder v. Wersant, No. 4:17-CV-00537, 2017 WL 5904720, at *2 (S.D. Tex. Sep. 29, 2017) (citing In re Chinese Mfr'd Drywall Prods. Liab. Litig., 742 F.3d 576, 594 (5th Cir. 2014)).

[2] As it must on a motion to dismiss for failure to state a claim, the Court accepts facts in Plaintiff's complaint as true. See, e.g., United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013).

[3] At all relevant times, Fox claims that the University "receive[d] substantial federal financial assistance…within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794." (Dkt. # 8 at 13.)

at 3.) She worked there for ten years before she was terminated on January 29, 2025, and she reported to Ms. Nicole Sherrod ("Sherrod") who served as Director of Administration and Finance in the Department of Computer Science. (Id. at 2–3.)[4]

In February 2024, Fox began experiencing "extreme fatigue, brain fog, delayed recall and memory issues and a significant amount of pain in her joints." (Id. at 4.)[5] Fox's symptoms caused her to "tak[e] significantly longer . . . to complete the tasks associated with her position [at the University]." (Id.) After Fox informed Sherrod of her symptoms, Sherrod responded by warning Fox not to discuss her symptoms with anyone else in the Department. (Id.) On May 2, 2024, Fox informed Sherrod and University Human Resources ("HR") personnel about her symptoms and efforts to obtain a diagnosis. (Id.) Staff from HR informed Fox that they would be providing her with an FMLA request packet, and "Sherrod advised [her] that the ADA office would be reaching out to her." (Id.)

---

[4] On January 24, 2025, Plaintiff had filed an EEOC charge alleging "disability discrimination, retaliation and related unlawful conduct occurring during her employment." (Dkt. # 8 at 2–3.) Then, on May 16, 2025, Plaintiff amended her EEOC charge "to include additional retaliatory conduct and termination-related claims." (Id. at 3.) The EEOC issued Plaintiff a Notice of Right to Sue Letter on December 11, 2025. (Id.) Thereafter, Plaintiff timely filed this action. (See id.)

[5] Fox was diagnosed with Lupus in June 2024. (Id. at 5.)

Then, on May 30, 2024, Sherrod gave Fox a poor performance review; Fox objected to this report. (See id.) Approximately a week later, on June 5, 2024—and one day after Fox received her official Lupus diagnosis—Fox shared her score of "74 out of 75" on a "burnout assessment she completed through the University's Employee Assistance Program." (Id. at 5.) After hearing the results of Fox's burnout assessment, Sherrod insisted that Fox approve the performance review by close of business that day. (Id.)

On June 12, 2024, Fox had an intake meeting with the University's ADA office. (Id.) The parties discussed Fox's request for an accommodation to work remotely full-time and to have a flexible schedule that permitted rest periods and additional time to complete tasks impacted by her disability. (Id.) During this meeting, Fox informed the ADA office that Sherrod had informed Fox that "Fox would be required to notify the IT team whenever she would be away for more than a couple of hours so that an out-of-office message could be posted, [and this] made []Fox uncomfortable." (Id.) The ADA representative, Jennifer Maedgen ("Maedgen"), emailed Fox the next day, June 13, 2024, to inform Fox that she had spoken with Sherrod and Sherrod "was amenable to [Fox] working full-time remotely and on a flexible schedule to accommodate medical appointments and symptom management while applying for FMLA leave." (Id. at 6.) Maedgen issued Fox a written accommodation approval letter on June 14, 2024. (Id.) The

letter reflected an agreement that Fox, Sherrod, and the ADA office had reached regarding the out of office messages: Fox would not need to alert IT to post one unless she planned to be out of the office for a full day or more, otherwise she "was to inform [] Sherrod via email or Slack if she was going to be gone longer than two hours." (Id.) The Department also hired a temporary employee to cover for Fox's reduced workload. (See id.)

On June 21, 2024, Fox attended a team meeting at which she asked "limited clarifying questions regarding the division of responsibility between the team and the temporary worker because she had received conflicting information." (Id. at 7.) Sherrod responded by publicly reprimanding Fox in front of the team and "accused her of attempting to avoid her job duties." (Id.) Immediately thereafter, Sherrod instructed the other team members to "publicly state how long it took them to complete specific tasks." (Id.) Fox alleges that Sherrod did so with the prior knowledge that Fox's disability affected the time needed to perform job-related tasks. (See id.) To Fox, this exercise at the meeting amounted to public humiliation and "portray[ed] her as a weak or underperforming employee because of limitations related to her disability." (Id.)

On July 3, 2024, Fox received approval of her FMLA paperwork. (Id.) Moreover, Fox claims that all relevant parties within the Department and the HR team "had been made aware" that the effective "start date" of Fox's FMLA

paperwork was June 1, 2024. (Id.) Two days later, Fox advised Sherrod that she was still behind on her workload because her pre-disability workload, which reflected a 40–50 hour work week, had not yet been reduced. (See id.)

Then, on July 12, 2024, a date on which Fox alleges that Sherrod was slated to be out of the office, Fox attempted to inform Sherrod via email that Fox would not be working because she was feeling ill. (Id. at 8.) That email message from Fox to Sherrod was not delivered, however, and Fox claims that she received a message from Sherrod and 9:49 a.m. expressing her uncertainty as to Fox's status at work for that day. (Id.) In the same message, Sherrod also imposed multiple requirements with which Fox was expected to comply and which, Fox claims, were imposed *because* she was ill and offline as a result of her disability.[6]

Across the next several months, the situation further deteriorated. After reaching out to Chief of Staff for the Department, Brent Winkelman ("Winkelman"), on July 29, 2024, to request a meeting, Fox received a Zoom link for a 3:00pm meeting with Winkelman on July 31, 2024. (Id. at 8–9.) On July 31,

[6] The requirements were as follows: "(1) Ms. Fox was to maintain a daily time log in 30-minute increments, detailing all work completed and communications ; (2) Ms. Fox was to meet with Ms. Sherrod every day for 30 minutes to go over all initiated, pending, and completed tasks; (3) Ms. Fox was to share her work calendar with Ms. Sherrod; (4) Ms. Fox was to CC Ms. Sherod on all work e-mails; (5) Ms. Fox was to accept all read receipts from Ms. Sherrod; (6) Ms. Fox would have any requests for over-time denied." (Id. at 8.)

2024, and sometime before the scheduled ad hoc meeting with Winkelman, Fox opened a Zoom link for a standing weekly meeting with Sherrod. (See id. at 9.) After she logged onto the meeting, Fox saw Sherrod turned away from the camera and overheard her speaking with Winkelman, who was outside the camera's view. (See id.) Fox claims that both Sherrod and Winkelman made disparaging remarks about her as an employee, her disability, and her FMLA leave and ADA accommodations. (See id.) When Fox eventually said something after many minutes had passed of her observing Sherrod and Winkelman's colloquy, Winkelman screamed "'What the fuck!?' and came into view of the camera, from the left." (Id.) At this point, "Sherrod put her hands to her head and said, 'You've got to be fucking kidding me.'" Winkelman yelled, 'What the fuck is she doing here?'" (Id. at 10.)

Later that day, Fox attended her aforementioned ad hoc meeting with Winkelman. Winkelman instructed Fox that "FMLA only protects your job. It doesn't require us as the employer to modify your workload in any way to match the hours you're working." (Id.) Then, on August 1, 2024, Fox met with the Director of HR to discuss the conversation she had overheard between Sherrod and Winkelman. (Id.) Fox also met with the University's Department of Investigation and Adjudication ("DIA") and "filed an official complaint which stated that Ms. Sherrod had discriminated against and harassed [her]" because of her invocation of

the ADA and the FMLA. (Id.) That claim was adjudicated on October 30, 2024, and the DIA found that insufficient evidence supported Fox's allegations. (Id. at 11.) Fox appealed, but her appeal was dismissed. (Id.)

On November 22, 2024, Fox received a letter signed by Sherrod and Winkelman "demanding that she resign from her position." (Id.) The letter stated that she would need "to meet all job requirements and expectations, would be ineligible for a merit increase or transfer for a period of twelve months, and that any further disciplinary issues during that period would result in termination of her employment." (Id. at 11–12.) Upon her return from an approved vacation on December 16, 2024, Fox learned that Sherrod was no longer employed by the University as of December 1, 2024. (See id. at 12.) On December 20, 2024, Winkelman and Fox were supposed to meet, but Winkelman cancelled the meeting. (Id.) Then, upon Fox's return from emergency medical leave on January 22, 2025, Fox attempted to reschedule the meeting but was informed that Winkelman was unavailable. (Id. at 12–13.)

Lastly, Winkelman sent an Intent to Terminate letter to Fox on January 24, 2025, which cited "neglecting duties or failing to meet a reasonable and objective measure of efficiency and productivity" as cause supporting Fox's termination. (Id. at 13.) Fox responded in writing to the Notice of Intent to Terminate on January 28, 2025, and received a Final Notice of Termination letter

form Winkelman the next day, January 29, 2025. (Id. at 13.) Fox appealed her termination, but it was upheld by David Vanden Bout, Interim Executive Vice President and Provost. (Id.)

III. Legal Allegations

Fox pleads four violations of the Americans with Disabilities Act ("ADA"). (See id. at 14–15 (discrimination); id. at 15–16 (failure to accommodate); id. at 17–18 (retaliation); id. at 18–21 (hostile work environment).) Fox also pleads four violations of the Section 504 of the Rehabilitation Act ("Rehab Act" or "RA"). (See id. at 21–22 (discrimination); 22–24 (failure to accommodate); id. at 24–27 (retaliation); id. at 27–29 (hostile work environment).)

## LEGAL STANDARD

I. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1); see Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006). "Sovereign immunity is jurisdictional in nature," and a court reviewing a motion to dismiss on sovereign immunity grounds apply the Rule 12(b)(1) standard. F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994); see, e.g., Warnock v. Pecos Cnty., 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not

with prejudice."). When evaluating a Rule 12(b)(1) motion, "the general rule . . . is to take allegations as true unless denied or controverted by the movant." Fed. Bureau of Investigation v. Fikre, 601 U.S. 234, 237 n.1 (2024) (quoting 5C C. Wright & A. Miller, Federal Practice and Procedure § 1363, p. 107 (3d ed. 2004)) (citation modified). The Court may dismiss a suit "for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Freeman v. United States, 556 F.3d 326, 334 (5th Cir. 2009) (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)).

II. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." When analyzing a motion to dismiss for failure to state a claim, the Court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" Kellogg Brown, 727 F.3d at 346 (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)). The Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."

Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (quoting Tellabs Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss. See Twombly, 550 U.S. at 555–56; cf., e.g., Lowy v. Daniel Def., LLC, 167 F.4th 175, 193 (4th Cir. 2026) ("Plaintiffs are not required to prove their case in the complaint." (citation modified)).

In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action. See Twombly, 550 U.S. at 556–57. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess

Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (citation omitted). However, "a motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" Turner v. Pleasant, 663 F.3d 770, 775 (5th Cir. 2011) (quoting Harrington v. State Farm Fire & Cas. Co., 563 F.3d 141, 147 (5th Cir. 2009)).[7]

## DISCUSSION

### I. Sovereign Immunity

As a threshold matter, "[s]overeign immunity is the privilege of the sovereign not to be sued without its consent." Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 253 (2011).[8] By its plain text, the Eleventh Amendment forbids the application of "[t]he Judicial power of the United States . . . to any suit in law or equity, commenced or prosecuted against one of the United States by

[7] When a 12(b)(6) motion is granted, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002). But see infra (discussing exceptions to this rule).

[8] *Sovereign immunity*, Black's Law Dictionary (12th ed. 2024) ("A state's immunity from being sued in federal court by the state's own citizens.").

Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. And, although not a dead ringer, "the Supreme Court has often used [the term] 'Eleventh Amendment immunity' as a synonym for the States' broader constitutional sovereign immunity" from suit. Sullivan v. Tex. A&M Univ. Sys., 986 F.3d 593, 596 n.1 (5th Cir. 2021). In fact, since 1890, the Supreme Court has "understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant." Stewart, 563 U.S. at 253 (citing Hans v. Louisiana, 134 U.S. 1 (1890)).

Still, the Supreme Court has recognized that sovereign immunity is not absolute. A State can waive its sovereign immunity. See, e.g., Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675–76 (1999) (reaffirming that a State may waive its sovereign immunity at its "pleasure" (citation omitted)). And Congress can abrogate it. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 65 (1996) (observing that Congress can abrogate a State's sovereign immunity pursuant only to the Section 5 of the Fourteenth Amendment).

A. ADA Claims

"Congress did not abrogate the states' sovereign immunity in enacting Title I of the ADA." Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 326 (5th Cir. 2002) (citing Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 365–74

(2001)). Plaintiff's Title I ADA claims are therefore barred by sovereign immunity and **DISMISSED** under Rule 12(b)(1).

To the extent that Plaintiff seeks leave to amend her FAC, such a request is **DENIED**. Simply put, the Court lacks subject-matter jurisdiction over claims that sovereign immunity precludes. See, e.g., Warnock, 88 F.3d at 343. It thus follows that "where[, as here] the [C]ourt lacked subject-matter jurisdiction over the entire action . . . [the Court is] without jurisdiction [and] has no authority to act [on that claim]—not even to grant leave to amend or supplement." (citations omitted)); see also Lopez v. State Farm Lloyds, 780 F. Supp. 3d 663, 680–81 (W.D. Tex. 2025) (collecting authorities).

II. Rehab Act Claims[9]

Unlike Title I of the ADA, "[a] State is amenable to suit where it operates a program in violation of the Rehabilitation Act and accepts federal financial assistance for that state program." Sullivan v. Texas A&M Univ. Sys., 986 F.3d 593, 597 (5th Cir. 2021) (citing Pace v. Bogalusa City Sch. Bd., 403 F.3d

[9] The Court notes that Defendant seeks only to dismiss Plaintiff's ADA claims and the hostile work environment Rehab Act claim. See, e.g., E.M. b/n/f Guerra v. San Benito Consol. Indep. Sch. Dist., 374 F. Supp. 3d 616, 623 (S.D. Tex. 2019) ("Where a defendant does not address a claim in their motion to dismiss, a district court may decline to address whether the plaintiff's pleading of that claim is adequate."); cf. Shield Indus. Coatings, LLC v. Shield Liners, LLC, No. 4:24-CV-01753, 2025 WL 4716821, at *1 (S.D. Tex. Sep. 29, 2025).

272, 288–89 (5th Cir. 2005) (en banc)); accord Campbell v. Lamar Inst. of Tech., 842 F.3d 375, 379 (5th Cir. 2016) (describing such a waiver as knowing[] and voluntar[y]" (citing Pace, 403 F.3d at 274)). Here, Plaintiff has alleged that the University's conduct violated four distinct provisions of the Rehab Act. (See Dkt. # 8.)

At the outset, the Court notes that "[t]he RA and ADA are judged under the same legal standards, and the same remedies are available under both Acts." Strife v. Aldine Indep. Sch. Dist., 138 F.4th 237, 245 n.2 (5th Cir. 2025) (quoting Kemp v. Holder, 610 F.3d 231, 234 (5th Cir. 2010) (per curiam)). "The only material difference between § 504 and Title II of the ADA lies in their respective causation requirements. Section 504 requires that the plaintiff's disability be the 'sole reason' for the exclusion or denial of benefits, but the ADA's standard is less stringent." J.W. v. Paley, 81 F.4th 440, 449 (5th Cir. 2023) (citation modified). Accordingly, and with reference to Fifth Circuit's ADA precedent, the Court analyzes Fox's Rehab Act claim for hostile work environment. See Strife, 138 F.4th at 245 n.2; cf. E.M. b/n/f Guerra, 374 F. Supp. 3d at 623 (explaining that a district court need not evaluate claims that a defendant does not clearly move to dismiss).

A. Hostile Work Environment

To plead a plausible claim for hostile work environment under the ADA, a Plaintiff must allege:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

Patton v. Jacobs Eng'g Grp., Inc., 874 F.3d 437, 445 (5th Cir. 2017) (quoting Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235–36 (5th Cir. 2001)). "Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 651 (5th Cir. 2012) (quoting Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002)). This is the same standard as Title VII. See Flowers, 247 F.3d at 235.

To be sure, "[t]he legal standard for workplace harassment in this circuit is . . . high." Gowesky v. Singing River Hosp. Sys., 321 F.3d 503, 509 (5th Cir. 2003). And "whether an environment is hostile or abusive depends on the totality of the circumstances,' and factors such as 'the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating,

and the degree to which the conduct unreasonably interferes with an employee's work performance,' are considered." Strife, 138 F.4th at 248 (5th Cir. 2025) (quoting Alaniz v. Zamora-Quezada, 591 F.3d 761, 771 (5th Cir. 2009)).

The University argues that Fox's allegations concerning, *inter alia*, changes to her working conditions and reduced autonomy—even if they occurred as a result of her decision to identify her disability and request accommodations—do not state a claim for hostile work environment. (See Dkt. # 9 at 7.) In support of this proposition, the University cites numerous persuasive authorities. (Id. at 7–8 (first citing Robinson v. Paulson, No. CIV.A. H-06-4083, 2008 WL 4692392, at *18 (S.D. Tex. Oct. 22, 2008) (summary judgment); then citing Ellis v. Principi, 246 F. App'x 867, 871–72 (5th Cir. 2007) (summary judgment); then citing Hendricks v. Boy Scouts of Am., No. 3:15-CV-00304-M, 2015 WL 5459612, at *3 (N.D. Tex. Sep. 16, 2015) (motion to dismiss); and then citing Cobos v. Decypher Techs., LTD., No. SA-24-CA-01470-XR, 2025 WL 3215364, at *9 (W.D. Tex. Nov. 10, 2025) (motion to dismiss)).)[10] Plaintiff responds by reciting the elements

[10] As a threshold matter, none of the cases that the University cites in its Motion to Dismiss is published. Therefore, none binds the Court. See United States v. Sauseda, 596 F.3d 279, 282 (5th Cir. 2010). Moreover, Robinson and Ellis concern the evidentiary burden—not pleading standard—that a plaintiff must carry to withstand a motion for summary judgment on hostile work environment claims. See Robinson, 2008 WL 4692392, at *18; Ellis, 246 F. App'x at 871–72.

required to state a claim for hostile work environment under the Rehab Act and citing scant authority applicable to the Fifth Circuit's *pleading* requirements for hostile work environment claims. (See Dkt. # 10 at 6–12 (collecting cases).)

Ultimately, the Court finds two of Defendant's authorities—Hendricks and Cobos—to be persuasive in its analysis. For example, in Hendricks, the district court reaffirmed that "[t]o state a claim for relief, [the plaintiff] must plead facts that allow the Court to reasonably infer that the alleged harassment was sufficiently severe to alter the conditions of his employment and create an abusive working environment." 2015 WL 5459612, at *3 (citing Stone v. La. Dept. of Revenue, 590 F. App'x 332, 340–41 (5th Cir.2014)).[11] The Hendricks plaintiff alleged that his employer created a hostile work environment by "reducing the headcount in his department, assigning him additional projects, increasing his workload, and denying him assistance with his workload," as well as "requir[ing] him to attend daily meetings to review his work, institut[ing] a new policy that prohibited him from using his personal computer in the work place, and gave him a negative evaluation on his annual review." Id. The court weighed whether the defendant employer's alleged conduct did not "unreasonably interfered with

[11] The Court notes that same standard applies to Fox's pleadings in this case, and Fox alleges similar conduct against the University as the plaintiff did in Hendricks.

[plaintiff's] work performance," and it concluded that it did not. Id. (quoting Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir.2002) (internal citations omitted).

Cobos compels a similar result. Cf. 2025 WL 3215364, at *9 ("The conduct Plaintiff complains of, taken as true, does not support an inference of sufficiently pervasive or severe harassment to support her disability based hostile work environment claim. Most of [Fox's] allegations concern criticism, questioning her value to [Defendant] and the quality of her work, and micromanagement of her attendance and whereabouts. But criticism of an employee's work performance and careful monitoring of job performance generally do not amount to a hostile work environment." (first quoting Gonzales v. Wells Fargo Bank, Nat'l Ass'n, 733 F. App'x 795, 798 (5th Cir. 2018) ("'[C]areful monitoring of job performance[ ]' . . . does not rise to the level of hostile work environment harassment."); and then quoting Credeur v. Louisiana, 860 F.3d 785, 796 (5th Cir. 2017) ("Criticism of an employee's work performance . . . and even threats of termination do not satisfy the standard for a harassment claim.")).

Here, the conduct that Fox complains of includes being "publicly singled out regarding the pace of her work, subjected to daily monitoring, allegations of faking her illn[e]ss [*sic*] and heightened oversight not previously imposed upon her, stripped of discretion over her workload and work processes,

and repeatedly humiliated and disparaged regarding her disability and need for her accommodations." (Dkt. # 8 at 28.) Fox further alleges that "[t]he conduct occurred repeatedly over a period of months and created a workplace environment characterized by fear, anxiety, humiliation, and constant scrutiny." (Id.) Under the Fifth Circuit's requirements for hostile work environment claims, this is not enough. Cf. Cobos, 2025 WL 3215364, at *9. Accordingly, the Court concludes that the totality of the circumstances, although certainly highly problematic as pleaded, do not state a claim upon which relief can be granted under the Rehab Act. See Strife, 138 F.4th at 248. The formulaic recitation of the elements of such a claim in Plaintiff's FAC requires this Court to dismiss the claim. Twombly, 550 U.S. at 556–57. It is hereby **DISMISSED WITH PREJUDICE**.

As previously mentioned supra, Plaintiff requests leave to amend. (See Dkt. # 10 at 13–14.) Plaintiff specifies that leave to amend should be granted because "[d]iscovery has not commenced, no scheduling order deadlines would be disrupted, and [the University] cannot demonstrate any prejudice from permitting further amendment should the Court identify a pleading deficiency." (Dkt. # 10 at 14.) However, Fifth Circuit precedent is clear that "the requesting party [must] ha[ve] set forth with particularity the grounds for the amendment and the relief sought." U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc., 336 F.3d 375, 387 (5th Cir. 2003); see also id. ("A bare request in an opposition to a motion to

dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a).” (quoting Confederate Mem’l Ass’n, Inc. v. Hines, 995 F.3d 295, 299 (D.C. Cir. 1993) (citation modified)). Moreover, amendment is “futile if it would fail to state a claim upon which relief could be granted.” Legate v. Livingston, 822 F.3d 207, 211 (5th Cir. 2016). Here, Plaintiff’s proffered grounds for amendment are not particular. She makes general citations to the Rule 15(a) standard and Fifth Circuit cases so construing it. (See Dkt. # 10 at 13–14.) Under the 12(b)(6) standard, therefore, amendment would be futile because Plaintiff has not identified any factual allegations that would state a claim for hostile work environment under the Rehab Act in a subsequent complaint. See Phillips v. Ethicon Endo-Surgery, Inc., --- F.4th ---, No. 25-50116, 2026 WL 2969090, at *4 n.3 (5th Cir. Oct. 2, 2026) (affirming a district court’s denial of leave to amend in light of “[p]laintiffs’ failure to provide any indication of how they could improve their pleadings”). Accordingly, Plaintiff’s request for leave to amend her challenged Rehab Act claim is **DENIED**.

## CONCLUSION

Based on the aforementioned reasons, the Court **GRANTS** Defendant’s Motion to Dismiss (Dkt. # 9). Plaintiff’s ADA claims are **DISMISSED WITHOUT PREJUDICE**. Plaintiff’s Rehab Act claim for hostile work

environment is **DISMISSED WITH PREJUDICE**. However, because the University does not meaningfully challenge Plaintiff's three other claims under the Rehab Act, those claims shall proceed to discovery.

**IT IS SO ORDERED.**

**SIGNED:** Austin, Texas, November 4, 2026.

______________________________
David Alan Ezra
Senior United States District Judge